IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KETAN PATEL | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) No.   13 C 468 |
| MAHENDRA WAGHA and PORTFOLIO | ) |
| DIVERSIFICATION GROUP, INC., | ) Judge Virginia M. Kendall |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ketan Patel filed suit against Defendant Portfolio Diversification Group, Inc. ("PDG") and its President, Mahendra Wagha alleging breach of contract, common law fraud, and breach of fiduciary duty under Illinois law (Counts I-III, respectively), as well as violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 (Count IV). Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Count IV of Patel's Complaint for failure to state a claim upon which relief may be granted. As Count IV contains Patel's only federal claim and is the sole basis for this Court's jurisdiction, Defendants also move pursuant to Rule 12(b)(1) to dismiss the remaining counts for lack of subject matter jurisdiction. For the reasons stated herein, the Court denies Defendants' Motion to Dismiss Count IV and denies as moot Defendants' Motion to Dismiss Counts I-III.

**STATEMENT OF FACTS**

The following facts are taken from Patel's Complaint and are assumed to be true for purposes of Defendants' Motion to Dismiss. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). All reasonable inferences are drawn in favor of Patel, the non-moving party. *See*

*Killingsworth v. HSBC Bank*, 507 F.3d 614, 618 (7th Cir. 2007) (citing *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006)).

Patel had saved funds in anticipation of acquiring a number of 7-Eleven convenience stores. (Complaint, ¶ 6.) After saving over $500,000, Patel was approached by Defendant Wagha to invest the funds. (*Id.*) Patel and Wagha met in-person on February 8, 2011 at the Defendants' office in Schaumburg, Illinois to discuss the potential investment. (*Id.*)

At a follow-up meeting on February 15, 2011, Patel informed Wagha that the funds were earmarked for purchasing 7-Eleven stores in less than three months. (*Id.* ¶ 7.) Wagha responded by recommending that Patel hire the Defendants to invest the funds for the three months leading up to the purchase. (*Id.*) At first, Patel declined to invest with Wagha. (*Id.*) However Wagha assured Patel that through PDG, he would invest the funds in a safe investment with little to no risk of loss prior to the closing date for the 7-Eleven purchase. (*Id.* ¶ 8.) Patel made it clear to Wagha that he would only hire the Defendants if they were sure that their investment decision would in no way jeopardize the availability of the funds to purchase the 7-Eleven stores. (*Id.*) Wagha assured Patel's that the investments he would make would be designed for low-risk and low-return in anticipation of Patel withdrawing the funds in less than three months. (*Id.* ¶ 9.) Wagha further assured Patel that the funds would be available for the purchase of the convenience stores. (*Id.*)

After much discussion about Patel's investment objectives and after Wagha's repeated assurances that he would invest Patel's money in low-risk investments, Patel agreed to hire the Defendants. (*Id.* ¶ 9.) On February 14, 2011, Patel entered an Agreement with PDG to serve as his Investment Advisor (the "Agreement"). (*Id.* ¶ 11.) At the February 15 meeting, Patel gave the Defendants cash funds of $511,000 along with paperwork to transfer $49,937 from his retirement

account. (*Id.*) The Agreement between Patel and the Defendants utilized a third-party custodian, TD Ameritrade, to act as the clearing agent for all of the Defendants' trades. (*Id.* ¶ 14.) Shortly after the Agreement was signed and Patel's account was created, Patel invested his $511,000 in savings and $49,937 from his IRA account into his account with the Defendants. (*Id.* ¶¶ 15–16.) Patel met with the Defendants at their office in Schaumburg on several occasions and was assured by Wagha each time that the initial investment plus any profits would be returned to him so that he could purchase the 7-Eleven stores in April 2011. (*Id.* ¶ 17.)

Instead of investing the money in low-risk investments, the Defendants invested Patel's funds in highly risky options trading. (*Id.* ¶ 21.) In doing so, the Defendants used Patel's money in an unauthorized manner. (*Id.*) In less than four months, these unauthorized investments lost nearly $400,000 in value. (*Id.* ¶ 22.) On March 23, 2011, Patel contacted Wagha by email to remind him that he would be withdrawing his funds in April 2011. (*Id.* ¶ 18.) The Defendants ignored this email and on March 25, 2011, Patel visited the Defendants' office to inquire about the investment. (*Id.* ¶ 19.) Wagha met with Patel during his visit and informed him that the money was available in full whenever he needed it. (*Id.* ¶ 20.) In early June 2011, Patel contacted Wagha to retrieve his funds in order to purchase the conveniences stores he had discussed with the Defendants. (*Id.* ¶ 23.) During this conversation, Wagha informed Patel for the first time that he could not return the funds because the securities the Defendants purchased had plummeted in value. (*Id.* ¶ 24.) He also informed Patel, also for the first time, that contrary to Patel's instructions he had invested the money into risky options trading in search of a large return and that the investment lost close to $400,000 in value. (*Id.* ¶ 25.) As a result, Patel was forced to find alternative means to refinance the purchase of the convenience stores. (*Id.* ¶ 26.)

After purchasing the stores, Patel set up another meeting with Wagha to understand how the Defendants lost his money through unauthorized trades. (*Id.*) Patel and Wagha met at the Defendants' office on June 6, 2012. (*Id.* ¶ 27.) At that meeting, Wagha took responsibility for the Defendants' error, acknowledged Patel's specific instructions, and acknowledged that the trades were unauthorized. (*Id.*) Wagha also stated that he made the trades in the hopes of earning greater commissions. (*Id*.) Per Patel's instruction, the Defendants liquidated the remaining funds in Patel's account and delivered Patel a check for $175,000. (*Id.* ¶ 28.) On June 10, 2011, Patel wrote Wagha an email expressing his frustration with how the Defendants ignored his instructions and misrepresented their intentions regarding how they would invest his savings. (*Id.* ¶ 29.) In response, Wagha acknowledged in writing that Patel's "worry and anger are justified" and that he took "full and complete responsibility." (*Id.* ¶ 30, Exhibit 2.)

Count I of Patel's Complaint alleges that PDG breached Sections 1 and 3 of the Agreement by failing to follow Patel's investment objectives and investing in highly volatile options.[1] (*Id.* ¶ 37.) Count II of Patel's Complaint alleges that Wagha and PDG engaged in common law fraud by knowingly and falsely representing to him that Wagha would invest in low-risk investment vehicles. (*Id.* ¶¶ 41–42.) Patel alleges that he reasonably and justifiably relied on these misrepresentations when he opened and maintained an account with the Defendants in which he invested over $500,000. (*Id.* ¶¶ 44–45.) Patel further alleges that he suffered damages of at least $400,000 as a result of his reliance on the Defendants' misrepresentations. (*Id.* ¶ 48.) Count III of

---

[1] Section 1 of the Agreement provides in relevant part that "[o]n behalf of the client, [PDG] will buy, sell, exchange, convert, and otherwise trade in any and all Mutual Funds, Annuities, and Life contracts and the sub-accounts thereof, Stocks, Bonds, and other securities consistent with the Investment Analysis interpretations and judgments designed to seek investment return suitable to the Investment Objectives and goals of the Client." (*Id.* ¶ 12, Exhibit 1.) Section 3 of the Agreement provides in relevant part that as part of the Defendants' services, the Defendants would have Wagha consult with Patel from time to time about his investment objectives and would take action in the best interest of Patel in accordance with his investment objectives. (*Id.* ¶ 13, Exhibit 1.)

Patel's Complaint alleges that Defendants Wagha and PDG breached their fiduciary duties of care and loyalty toward Patel by misrepresenting the nature of the investments they planned to make for him and by misappropriating Patel's funds and investing them in ways that ignored his instructions and compromised his investment objectives. (*Id.* ¶¶ 51–52.) Count IV, Patel's only federal claim and the sole basis for this Court's jurisdiction,[2] alleges that the Defendants violated Section 10(b) of the Security and Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 of the Security Exchange Commission, 17 C.F.R. 240.10b-5, which makes it unlawful to defraud someone, to make any untrue statement of material fact, or to engage in any fraudulent or deceitful act or practice in connection with the purchase or sale of a security. (*Id.* ¶ 56.)

## **STANDARD OF REVIEW**

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts as true all facts alleged in the complaint and construes all reasonable inferences in favor of the plaintiff. *Killingsworth*, 507 F.3d at 618 (citing *Savory*, 469 F.3d at 670); *accord Murphy*, 51 F.3d at 717. To survive a Rule 12(b)(6) motion, "the complaint need only contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *EEOC v. Concentra Health Svcs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting Fed.R.Civ.P. 8(a)(2)). The facts in the complaint must provide the defendant with "fair notice of what the … claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In addition, Federal Rule of Civil Procedure 9(b) requires all allegations of fraud to be "state[d] with particularity," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Rule 9(b) requires that the plaintiff

---

[2] Plaintiff and both defendants are domiciled in the State of Illinois. (Complaint, ¶¶ 3–5.)

"state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994). In other words, the plaintiff must allege "the who, what, when, where, and how" of the alleged fraud, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Financing Svc's, Inc.*, 536 F.3d 663, 668 (7th Cir. 2008)); "the first paragraph of any newspaper story," *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

      In addition to the particularity requirements of Rule 9(b), the Private Securities Litigation Reform Act, 15 U.S.C. § 74u-4 *et seq.*, further heightens the pleading standard for plaintiffs alleging securities fraud claims. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594 (7th Cir. 2006) ("[T]he PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading—one that exceeds even the particularity requirement of Federal Rule of Civil Procedure 9(b)."). Under the PSLRA, a securities fraud complaint must: (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"; and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2). However, the motion to dismiss framework remains the same: accept all factual allegations as true and consider the complaint in its entirety. *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).

**DISCUSSION**

Section 10(b) of the Securities and Exchange Act of 1934 provides:

> It shall be unlawful for any person, directly or indirectly … [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated pursuant to Section 10(b), makes it unlawful:

> (a) To employ any device, or artifice to defraud,
>
> (b) To make any untrue statement of material fact or to omit a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to prevail on a Rule 10b-5 claim, the plaintiff must establish that the defendant: (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused the plaintiff's injuries. *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 155 (2008) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)); *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008); *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

The Defendants in this case do not challenge the level of particularity in Patel's Complaint, nor do they contend that Patel has failed to allege a material misstatement of fact with scienter upon which plaintiff relied to his financial detriment. Instead, they argue that Patel's allegations

7

fails to plead a violation of § 10(b) because his claims focus on the advisor's duties under the Agreement, not on the sale or purchase of a "security." That agreement, according to the Defendants, does not meet the requirements of an "investment contract" under 15 U.S.C. § 78c(a)(10) and therefore is not a "security" under the Act. Defendants submit that because Patel's claims center around an investor-investee agreement, they would more properly be litigated before the Financial Industry Regulatory Authority ("FINRA")[3] or, absent a FINRA arbitration provision in the Agreement, the state court.

The cases the Defendants rely upon—*Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274 (7th Cir. 1972), and *S.E.C. v. Lauer*, 864 F.Supp. 784 (N.D. Ill. 1994)—highlight the analytical flaw in this argument. In *Milnarik*, the plaintiffs entered an agreement with the defendant to trade commodity futures for their benefit. 457 F.2d at 275. When the investments went sour, the plaintiffs, recognizing that the "[f]utures contracts themselves are not securities" under the SEC Act, argued that the Act nevertheless governed because their agreement with the defendant was itself an "investment contract" and therefore a security. *Id.* The court rejected the plaintiffs' argument and held that the investor agreement with the broker was not itself an "investment contract" under the Act. *Id.* at 277–79. In *S.E.C. v. Lauer*, 864 F.Supp. 784 (N.D. Ill. 1994), several investors entered agreements and provided funds to the defendants with the understanding that those funds would be invested in "Prime Bank Instruments," an investment vehicle that in fact did not exist. *Id.* at 786. The court found that the manner in which funds were pooled satisfied the Seventh Circuit's "horizontal commonality" requirement for investment contracts and therefore

---

[3] "FINRA is a private, non-profit corporation that is registered with the Securities and Exchange Commission (SEC) as a 'national securities association.' Such private regulation was made possible by the Maloney Act, which provides for the establishment of self-regulatory organizations to oversee the securities markets. 15 U.S.C. §§ 78 *o et seq.* In this capacity, FINRA creates and enforces rules that govern the industry alongside the SEC and is subject to significant SEC oversight." *Aslin v. Financial Industry Regulatory Authority, Inc.*, 704 F.3d 475, 476 (7th Cir. 2013).

investment agreements were "securities." *Id.* at 789–92. Because the agreements themselves were securities, it was irrelevant that the "Prime Bank Instruments" were non-existent and arguably outside the scope of § 77b.[4] *Id.* at 793.

Unlike the futures commodities *Milnarik* and the "prime bank instruments" in *Lauer*, it is undisputed that the investment vehicles allegedly purchased by the Defendants in this case—high-risk options—qualify as securities under § 78c(a)(10). The term "security" for purposes of the Act is defined to include not only "investment contract[s]" but also "any put, call, straddle, *option*, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof)." 15 U.S.C. § 78c(a)(10) (emphasis added).[5] The phrase "any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities" was specifically inserted into Act's definitional language to expressly include various types of options within the definition of "security" and to make clear the exclusive jurisdiction of the Securities and Exchange Commission over them. *See* 15 U.S.C. §§ 77b(1), 78c(a)(1); Pub.L. 97-303, §§ 1, 2; H.Rep. No. 97-626; *Fry v. UAL Corp.*, 84 F.3d 936, 938 (7th Cir. 1996) ("Puts and other stock options are securities within the meaning of the Securities Exchange Act …") (citing 15 U.S.C. § 78c (a)(10), and *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750–51 (1975)); *see also Wharf (Holdings) Ltd. v. United Intern. Holdings, Inc.*, 532 U.S. 588 (2001) (Securities Exchange Act of 1934 "defines 'security' to include both 'any … option … on any security' and 'any … right to … purchase" stock"); *Margolis v. Caterpillar, Inc.*, 815 F.Supp. 1150, 1154 (C.D. Ill. 1991) ("It is undisputed that the statutory definition of a

---

[4] The *Lauer* court also suggested, without deciding, that even non-existent securities could fall within purview of federal securities laws. *Id.* at 792 (citing *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F.Supp. 531, 553 n. 10 (S.D.N.Y. 1990)).
[5] "[T]he definition of 'security' in the 1934 Act is essentially the same as the definition of 'security' in § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1)." *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982) (citing *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847, n. 12 (1975)).

'security' includes 'any put, call, straddle [or] option ….'"). Because the financial instruments the Defendants are alleged to have purchased with Patel's funds in violation of the Agreement qualify as securities, whether the Agreement itself is *also* a "security" under § 78c(a)(10) is beside the point.

Furthermore, the misrepresentations alleged in Patel's Complaint were undeniably made "in connection with" the purchase or sale of options. The Supreme Court has held that to effectuate its remedial purpose, the SEC Act should be construed flexibly, not technically and restrictively. *SEC v. Zandford*, 535 U.S. 813, 819 (2002). Accordingly, when the Court has sought to give meaning to the phrase "in connection with the purchase or sale" in the context of § 10(b) and Rule 10b-5, it has "espoused a broad interpretation." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (emphasis removed). To meet the "in connection with" requirement, it is sufficient that the fraudulent acts "coincide with" the sale of securities. *Id*; *Zandford*, 535 U.S. at 825. In this case, Patel alleges that the Defendants made numerous misrepresentations to him regarding the types of securities they would purchase with his funds. Patel further alleges that without his knowledge or approval and contrary to his express instructions, the Defendants engaged in the purchase of high-risk securities. These assertions sufficiently allege that the Defendants' intentional misrepresentations of material fact "coincided with" their purchase of "risky options."

Lastly, Patel alleges that he relied on the Defendants' misrepresentations and his reliance proximately caused a loss of over $500,000. Accordingly, the Court finds that Patel has properly alleged a claim under Rule 10b-5

## **CONCLUSION AND ORDER**

For the reasons stated herein, Defendants' Motion to Dismiss Count IV pursuant to Federal Rule of Civil Procedure 12(b)(6) is denied. Defendants' Motion to Dismiss the remaining counts pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction is denied as moot.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: June 24, 2013